NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**NINTENDO OF AMERICA INC., NINTENDO CO., LTD.,**
*Appellants*

**v.**

**ILIFE TECHNOLOGIES, INC.,**
*Appellee*

---

2016-2266

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2015-00109.

---

Decided: December 27, 2017

---

JOSEPH PRESTA, Nixon & Vanderhye P.C., Arlington, VA, argued for appellants. Also represented by ROBERT FARIS.

MICHAEL CRAIG WILSON, Munck Wilson Mandala, LLP, Dallas, TX, argued for appellee. Also represented by DANIEL E. VENGLARIK, SAMUEL WALLACE DUNWOODY, IV.

---

Before LOURIE, TARANTO, and CHEN, *Circuit Judges.*

CHEN, *Circuit Judge.*

iLife Technologies owns U.S Patent No. 6,864,796 (the '796 patent), which claims a system for sensing and evaluating a person's movement. On a petition for inter partes review filed by Nintendo of America Inc. (Nintendo), the Patent Trial and Appeal Board (Board) instituted review of several claims of the '796 patent in view of the Yasushi reference. During the proceeding, iLife argued that Yasushi was not prior art, presenting evidence to establish that its claimed invention predated Yasushi. Nintendo appeals from the Board's final written decision concluding that Yasushi was not prior art. Specifically, the Board found that (1) the challenged claims of the '796 patent were adequately supported by the written description of its grandparent application; and (2) the inventors of the '796 patent produced a working prototype by August 1998 that fell within the scope of all of the challenged claims. Because substantial evidence supports the Board's finding that the grandparent application provides sufficient disclosure of the subject matter of the challenged claims, we *affirm* as to that finding. However, only for some, but not all, of the challenged claims is there substantial evidence supporting the Board's finding that the inventors' 1998 working prototype reduced the claims to practice. We thus *affirm-in-part* and *reverse-and-remand-in-part* for the Board to consider Yasushi as a prior art reference for those claims reciting elements that were not contained in the working prototype.

BACKGROUND

A. The '796 Patent

The '796 patent is directed to systems for evaluating movement of a body relative to an environment (e.g., falls or irregular movement) by sensing the acceleration of the body, processing that acceleration to yield an output

signal, and transmitting the output signal to an external device or computer network.  Claim 1 is exemplary:

> **1.** A system within a communications device capable of evaluating movement of a body relative to an environment, said system comprising:
>
> a sensor, associable with said body, that senses dynamic and static accelerative phenomena of said body, and
>
> a processor, associated with said sensor, that processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic to thereby determine whether said evaluated body movement is within environmental tolerance[;]
>
> wherein said processor generates tolerance indicia in response to said determination; and
>
> wherein said communication device transmits said tolerance indicia.

Dependent claims directed to specific communication device embodiments (e.g. cell phones, computers) and additional types of indicia (e.g. state indicia, dynamic indicia) are also at issue in this case.

## B.  Proceedings before the Board

Nintendo asserted that claims 1–3, 9–12, and 18–20 of the '796 patent (the challenged claims) were unpatentable over Japanese Patent Publication H10-295649 (Yasushi), which was published November 10, 1998.  The Board's final written decision centered on whether Yasushi was in fact prior art to the challenged claims.  *See* IPR2015-00109, Paper 40 (P.T.A.B. Apr. 28, 2016).  The application from which the '796 patent issued is a continuation of application 09/727,974, which was filed on November 30, 2000.  The '974 application is a continuation-in-part of application 09/396,991 (the original application), filed on

September 15, 1999.  The Board assessed whether (1) the challenged claims were supported by the written description of the original application; and (2) whether iLife could establish an actual reduction to practice prior to Yasushi's November 1998 date.

The Board first held that the challenged claims are entitled to the priority date of the original application because that application disclosed a system according to the challenged claims along with various examples of the claimed "communications device" usable in the invention. The Board recognized that the original application disclosed a "system 11" which included a "sensor 25," a "processor," and an "indicating means 41" "operable to . . . communicate such state, or tolerance indicia to a monitoring controller."  J.A. 19 (quoting original application specification, J.A. 1257, 1259–60).  The Board further recognized that the original application disclosed that "indicating means 41 may take any number of forms" and that in the "present embodiment, stage 41 is an RF transmitter." J.A. 19 (quoting original application specification, J.A. 1260).

The Board disagreed with Nintendo's contention that the original application's only disclosed communications device was an RF transmitter.  The Board found that the original application disclosed that the invention could use other communication devices (besides RF transmitters) by stating that "system 11 may be implemented using any suitably arranged computer or other processing micro, personal, mini . . . as well as network combinations of two or more of the same."  J.A. 20–21 (quoting original application specification, J.A. 1261).  In addition, the Board recognized that when the communications device consists of the "advantageous embodiment [where] sensor 25 and processor 47 are not co-located, but rather associated wirelessly," the wireless receivers "may be any suitable cellular devices, including conventional cellular telephones, PCS handset devices, portable computers, meter-

ing devices, transceivers, and the like." J.A. 21 (quoting original application specification, J.A. 1271). Thus, the board found the range of communications devices described in the original application provided written description support for the recited "communications device" in the challenged claims. J.A. 21–22.

Next, the Board held that iLife had established an actual reduction to practice of the challenged claims prior to November 1998, the Yasushi prior art date. The Board relied on iLife's submission of declarations from the inventors and two corroborating witnesses to determine that "the inventors constructed a working prototype of the fall detection device and tested it on human subjects in August 1998." J.A. 24. The Board also found that the inventors prepared formal engineering drawings for further prototypes and tested those prototypes successfully in September 1998. J.A. 25–26. In making these findings, the Board additionally relied on contemporaneous notes and records provided by the inventors. J.A. 26. In order to determine that the challenged claims had been reduced to practice, the Board correlated the evidence provided by the inventors with each claim element to demonstrate that every element was present in the prototype produced by the inventors.[1] J.A. 26–30 (citing inventor evidence throughout). Thus, the Board concluded that the challenged claims were reduced to practice as early as August 1998, and therefore that Yasushi was not prior art

---

[1] The Board did not explicitly discuss claims 2, 3, 11, or 12 in its analysis. The Board appears to find the limitations of these claims, which are directed to the case where the communications device is a telephone or a computer, implicitly present in the statement by the inventors that the system would "activate an automatic telephone dialing module to call for help." J.A. 28 (quoting lead inventor declaration, J.A. 1968).

to any challenged claim.  The Board accordingly issued its final decision finding that the challenged claims had not been shown to be unpatentable.

STANDARD OF REVIEW

We review decisions of the Board under the standard of the Administrative Procedure Act (APA).  *Novartis AG v. Torrent Pharm. Ltd.*, 853 F.3d 1316, 1323 (Fed. Cir. 2017).  We hold unlawful and set aside the actions of the Board if they are "not in accordance with law" or "unsupported by substantial evidence."  5 U.S.C. § 706.

We review the legal conclusions of the Board de novo and review any underlying factual determinations for substantial evidence.  *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1332 (Fed. Cir. 2016).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

DISCUSSION

A.  Written Description

"[A] patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112."  *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008) (quoting *In re Chu*, 66 F.3d 292, 297 (Fed.Cir.1995)).  "To satisfy the written description requirement the disclosure of the prior application must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention.'"  *PowerOasis*, 522 F.3d at 1306 (quoting *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed.Cir.1991)).

The Board's finding that iLife possessed the claimed invention at the time of the original application is sup-

ported by substantial evidence. The Board recognized that the original application disclosed a system according to the invention including a sensor, a processor, and a communications device—i.e., a transmitter. *See* J.A. 19–20, 1257–60. In addition, the Board recognized that the original application disclosed the implementation of the invention using "any suitably arranged computer or other processing system including micro, personal, mini . . . as well as network combinations of two or more of the same." *See* J.A. 20–21, 1261. Furthermore, in the context of a specific embodiment of the invention, the Board recognized that the original application explained that the invention could be used in conjunction with "conventional cellular telephones, PCS handset devices, portable computers, metering devices, transceivers, and the like." *See* J.A. 21, 1271. A reasonable mind could understand this evidence to disclose to a skilled artisan a communications device according to the challenged claims.

Nintendo argues that under our opinion in *PowerOasis*, the Board was required to review the new disclosure added to the continuation-in-part application and determine whether that content corresponds to the particular claim limitations in dispute. This misreads our precedent. *PowerOasis*, along with our other written description precedent, explains that "[t]o satisfy the written description requirement ***the disclosure of the prior application*** must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention.'" 522 F.3d at 1306 (emphasis added) (quoting *Vas–Cath*, 935 F.2d at 1563–64). Thus, the key question is whether the descriptive matter is present in the original application, not whether it is also present in any added disclosure.

Nintendo also argues that the Board's written description analysis depends on its incorrect construction of

"communications device" to include the original application's disclosed device with an RF transmitter.[2]   But as Nintendo correctly recognizes, whether the RF transmitter is a "communications device" is not dispositive of the possession issue.   Rather, the issue the Board had to resolve was the debate over whether the original application disclosed sufficient types of "communication devices" to provide support for the claimed "communication device."   Challenged claim 2 is directed to the system of claim 1 "wherein said communications device comprises one of: a cordless telephone, a cellular telephone and a personal digital assistant."   Challenged claim 3 is directed to the system of claim 1 "wherein said communications device comprises one of: a hand held computer, a laptop computer and a wireless Internet access device."   Because claims 2 and 3 depend from claim 1, the scope of "communications device" in exemplary claim 1 must necessarily include telephones and personal computers in addition to any more rudimentary communications devices.   Thus, the Board could not—and did not—conclude that indicating means 41 and its RF transmitter, standing alone, demonstrate possession of the challenged claims.   Rather, the disclosure of the indicating means, which "may take any number of forms," J.A. 19, 1260, along with the disclosure of the use of the invention with computers and cellular telephones, is sufficient to persuade a reasonable mind that iLife possessed the full scope of communication

---

[2] While we need not reach the issue to resolve this appeal, we are inclined to think that the Board's partial construction of "communications device" as including "devices with an RF transmitter and devices with two-way communication," J.A. 15, is consistent with the broadest reasonable interpretation of the claims at issue. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2146 (2016).

devices in exemplary claim 1, including telephones and personal computers.

## B.   Reduction to Practice

"To demonstrate an actual reduction to practice, the applicant must have: (1) constructed an embodiment or performed a process that met all the limitations of the claim and (2) determined that the invention would work for its intended purpose." *In re Steed*, 802 F.3d 1311, 1318 (Fed. Cir. 2015).  That is, to reduce any particular claim to practice, the applicant must have constructed an operational embodiment within the scope of that claim. We review the Board's reduction to practice analysis in light of that requirement.

The Board's finding that exemplary claim 1 and similar claim 10 were actually reduced to practice by August 1998 is supported by substantial evidence.  The Board analyzed each claim limitation in turn and reasonably relied on the testimony of the inventors, corroborating witnesses, and corroborating documentary evidence from iLife's business files.  With regard to the preamble's disclosure of a "system . . . capable of evaluating movement of a body relative to an environment," the Board credited inventor testimony and corroborating witness testimony that the constructed prototype was "capable of monitoring the movements of an elderly person and automatically detecting real falls as opposed to normal daily activity."  J.A. 26 (citing Lehrman Declaration ¶ 4, J.A. 1961; James Declaration ¶ 4, J.A. 2026).  With regard to the limitation of a "sensor, associable with said body, that senses dynamic and static accelerative phenomena of the body," the Board credited inventor testimony and corroborating documentary evidence that the prototype used a "dual-axis accelerometer" which "was configured to measure static and dynamic acceleration to evaluate changes in the wearer's movement and orientation."  J.A. 27 (citing Lehrman Declaration ¶ 19, J.A. 1965–66; "Fall

Down" Project Definition, J.A. 2066). As to the limitation of a "processor, associated with said sensor, that processes said sensed dynamic and static accelerative phenomena as a function of at least one accelerative event characteristic," the Board credited inventor testimony and corroborating documentary evidence that the prototype used "a microprocessor with code configured to process the sensed static and dynamic acceleration to determine if the user had experienced a real fall as opposed to normal daily activities." J.A. 27 (citing Lehrman Declaration ¶ 18, J.A. 1966; PERS Fall Down Detection Method and System, J.A. 2069–71). As to the limitation of "wherein said processor generates tolerance indicia in response to said determination," the Board credited inventor testimony and corroborating documentary evidence that the prototype "generated and communicated information indicating whether the evaluated body was within tolerance to a base station for remote monitoring"[3] and that the prototype used the generated information to "activate an automatic telephone dialing module to call for help." J.A. 28–29 (citing Lehrman Declaration ¶¶ 30, 23, J.A. 1970–71, 1968; PERS Fall Down Detection Method and System, J.A. 2069–71). The Board also relied on the statements that the prototype "communicated information" and "activate[d] an automatic telephone dialing module" for the disclosure of the "communications device" limitation. J.A. 28–29 (citing Lehrman Declaration ¶¶ 30, 23, J.A.

---

[3] In addition to its relevance to claims 1 and 10, the statement "to a base station for monitoring" also shows that the prototype fell within claims 9 and 18, which depend from claims 1 and 10, respectively, and recite the additional limitations "wherein said communications device transmits said tolerance indicia to a monitoring controller" and "transmitting said tolerance indicia from said communications device to a monitoring controller," respectively.

1970–71, 1968; PERS Fall Down Detection Method and System, J.A. 2069–71). Substantial evidence supports the Board's finding that the record evidence discloses a "communication device" according to the claims 1 and 10.

Finally, the Board concluded that the prototype would work for its intended purpose based on inventor testimony and corroborating witness testimony that "[t]he prototypes all performed as expected and were suitable for their intended purpose of movement evaluation and fall detection when tested in August and September of 1998." J.A. 26–30 (quoting Lehrman Declaration ¶ 30, J.A. 1970–71; citing James Declaration ¶ 28, J.A. 2038–39). Throughout its analysis, the Board relied on not only the Lehrman declaration, but also on the other inventor declarations, the declarations of corroborating witnesses, and the corroborating contemporaneous evidence submitted by iLife. This evidence, taken together, is sufficient for a reasonable mind to conclude that the prototype created by the inventors by August 1998 was within the scope of claims 1 and 10 and would work for its intended purpose.

The Board's finding that dependent claims 2 and 11 were actually reduced to practice by August 1998 is also supported by substantial evidence. The Board does not explicitly explain how these claims were reduced to practice, but implicitly does so by explaining when the prototype "generated and communicated information indicating whether the evaluated body was within tolerance to a base station for remote monitoring" and used the generated information to "activate an automatic telephone dialing module to call for help," it satisfied the "communications device" limitation of claim 1. J.A. 28 (quoting Lehrman Declaration ¶¶ 30, 23, J.A. 1970–71, 1968). Under the deferential standard of review we apply to Board findings, the evidence of the use of a telephone module was sufficient for a reasonable mind to conclude that the inventors reduced these claims to practice.

The Board's finding that dependent claims 3 and 12 were actually reduced to practice by August 1998 is, however, not supported by substantial evidence. Like claims 2 and 11, the Board implicitly states that the prototype fell within these claims by its discussion of claim 1. Unlike claims 2 and 11, there is no evidence cited by the Board or discussed in the inventor declarations showing that any prototype contained "a hand held computer, a laptop computer, [or] a wireless Internet access device." Thus, there is no evidence sufficient to support the Board's conclusion as to these claims.

The Board's finding that dependent claims 19 and 20 were actually reduced to practice by August 1998 is also not supported by substantial evidence. Claim 19 is directed to the additional concept of generating and transmitting "state indicia," i.e., indicia of the current position and/or orientation of the sensor, while claim 20 is directed to generating and transmitting "an output signal that is indicative of measurements of both static and dynamic acceleration of said body in plural axes," i.e., dynamic indicia. In holding that these claims were reduced to practice, the Board relied on inventor testimony that the prototype measured "both static and dynamic acceleration" and "communicated information indicating whether the evaluated body was within tolerance to a base station." J.A. 29 (quoting Lehrman declaration ¶ 30, J.A. 1970–71). However, the statement that the prototype "communicated information indicating whether the evaluated body was within tolerance" is limited to the transmission of tolerance information, i.e., tolerance indicia. These portions of testimony do not disclose the transmission of state indicia or dynamic indicia as required by claims 19 and 20. The prototype has not been shown to meet all the limitations of these claims, *Steed*, 802 F.3d at 1318, and the record thus lacks evidence sufficient to support the Board's conclusion.

CONCLUSION

For the foregoing reasons, we *affirm* the Board's holding that all of the challenged claims were supported by the written description of the original application. We *affirm* the Board's holding that challenged claims 1, 2, 9–11, and 18 were reduced to practice prior to November 1998. We *reverse* the Board's holding that challenged claims 3, 12, 19, and 20 were reduced to practice prior to November 1998.[4] Because Yasushi is prior art as to those claims, we *remand* for further proceedings consistent with this opinion.[5]

**AFFIRMED-IN-PART, REVERSED-AND-REMANDED-IN-PART**

COSTS

No costs.

---

[4] iLife argues that Nintendo has waived any position that Yasushi is prior art under pre-AIA § 102(a) by characterizing it as prior art under pre-AIA § 102(b). We disagree. In Nintendo's Reply to Patent Owner's Response, it stated that an earlier priority date would "mak[e] Yasushi a 102(a) instead of a 102(b) reference." J.A. 2124. Thus, Nintendo's position at that time was that even if the challenged claims were entitled to the priority date of the original application, Yasushi would nevertheless be prior art under § 102(b).

[5] Because the claims of related U.S. Patent No. 7,095,331 that the Board found to be unpatentable in IPR No. IPR2015-00112 do not contain the "communications device" limitation central to this case, we decline Nintendo's invitation to hold claims 3, 12, 19, and 20 unpatentable based on collateral estoppel and remand for the Board to determine whether those claims are unpatentable over Yasushi.